IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00706-MEH

SCOTT ALAN STICKLINE,

     Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Scott Alan Stickline appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court affirms the ALJ's decision and the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying his applications

for DIB and SSI benefits filed January 30, 2012, in which he alleged his disability began October 1, 2009. [AR 168-180]   After the application was initially denied on April 30, 2012 [AR 76-101], an Administrative Law Judge ("ALJ") held a hearing on June 25, 2013 at the Plaintiff's request. [AR 50-75]   At the hearing, Plaintiff amended the alleged onset date of his disability to April 2, 2010. [AR 54]   The ALJ issued a written ruling on July 24, 2013, finding that Plaintiff was not disabled since April 2, 2010, because considering Plaintiff's age, education, work experience and residual functional capacity ("RFC"), he could perform his past relevant work and there were jobs existing in significant numbers in the national economy that Plaintiff could perform. [AR 17-33]   The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. [AR 2-7]   *See* 20 C.F.R. § 416.1481.   Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## II.   Plaintiff's Alleged Conditions

Plaintiff was born on April 13, 1963; he was 47 years old on the alleged disability onset date and 51 years old on the date of the hearing. [AR 25]   Plaintiff claimed he became disabled on April 2, 2010, and reported that he was limited in his ability to work by bipolar disorder, anxiety, depression, and chronic lower back pain. [AR 54, 221]   Plaintiff is a high school graduate with a two-year college degree in computer science. [AR 55, 438]

### A.   Mental Impairments

Plaintiff first took medication to treat symptoms of depression in the early 1990's, [AR 438], but did not obtain regular mental health care treatment until April 2011. [AR 371-436;

2

627-715].   On April 2, 2010, Plaintiff sought treatment at the Stout Street Clinic for depression and was prescribed Cymbalta.   [AR 394]   At a follow-up appointment the next month, Plaintiff reported that he did not feel better, and he was prescribed Wellbutrin in addition to Cymbalta.   [AR 392]   On July 23, 2010, Plaintiff was hospitalized for nausea, vomiting, and dehydration.   [AR 444-447]   On December 7, 2010, Plaintiff was hospitalized for methamphetamine intoxication, and was also discovered to have pneumonia.   [AR 328, 353]

Following the May 2010 visit, Plaintiff did not return to the Stout Street Clinic seeking treatment for depression until April 2011.   [AR 389]   He reported he had stopped taking Cymbalta and Wellbutrin because "he was frustrated that 'nothing worked'"; he was then prescribed Hydroxyzine and Zoloft.   [*Id*.]   On June 2, 2011, Plaintiff reported he still suffered severe anxiety and depression, poor appetite, weight loss, and possible auditory hallucinations.   [AR 388]   He reported he was still working odd jobs, but his motivation was extremely low.   [*Id*.]   On June 16, 2011, Plaintiff reported that his mood continued to be extremely dysthymic, he struggled to sleep, and he continued to lose weight.   [AR 388]   He was instructed to discontinue Hydroxyzine, increase Zoloft dosage, and begin taking Abilify.   [AR 387]

Plaintiff reported on July 15, 2011 that he had no improvement in his depression while taking Zoloft, and the doctor discussed the possibility that depression may not be the proper diagnosis.   [AR 386]   He was instructed to continue taking Zoloft and prescribed a higher dosage of Abilify.   [*Id*.]   On August 29, 2011, Plaintiff reported to the Stout Street Clinic that he had stopped all medication a week earlier and had noticed no difference.   [AR 427-429]   The provider introduced the possibility that Plaintiff had a mood disorder that was not depression and

prescribed the mood stabilizer, Lithium. [*Id*.] Plaintiff returned to the Stout Street Clinic on January 13, 2012 and reported that he had taken Lithium for a month "but stopped it because he felt it wasn't working." [AR 430] He was feeling frustrated and discouraged that medication was not helping his symptoms. [*Id*.] The provider discussed the possibility of a bipolar disorder diagnosis and was and prescribed Lamotrigine. [*Id*.] Plaintiff reported on February 14, 2012 that symptoms had worsened. [AR 433]

On May 11, 2012, Plaintiff reported he had again stopped all his medication, that "he didn't feel particularly worse or better" but that at one point his anxiety was almost "unbearable." [AR 663] The provider diagnosed bipolar disorder NOS but noted she was "unsure of diagnosis." [*Id*.] Plaintiff was prescribed Lexapro and Lorazepam. [AR 664] Symptoms of depression and anxiety continued in July, and the provider noted that "antidepressants haven't been activating and attempts at mood stabilizers haven't been impressive. May reconsider diagnosis." [AR 682] Providers continued to adjust medications in September, October and December 2012, but Plaintiff remained depressed and agitated, and had difficulty sleeping. [AR 691, 696, 698, 700, 703] A diagnosis of PTSD was added to the bipolar disorder diagnosis. [AR 692] Plaintiff started group therapy in January 2013 and continued for about a month. [AR 710, 714]

A.    Frederick Leidal, Psy. D.

The Disability Determination Services referred Plaintiff for a consultative psychological examination by Frederick Leidal, Psy. D. on April 20, 2012. [AR 437-442] Dr. Liedal noted that Plaintiff's allegations "related to disability are vague" and Plaintiff explained that when he

works he is "overwhelmed with depression for a long time, and it's getting worse[.]"   [AR 437]

Plaintiff last worked four months earlier but claimed he had been depressed for fifteen years.

[AR 438]

Plaintiff's activities of daily living included waking up, dressing, and taking care of

personal hygiene needs without assistance.   [AR 439]   Plaintiff spent time each day looking for

a job but sometimes felt too stressed and went home to sleep.   [*Id.*]   He was functional in his

ability to manage finances and transportation, though his social activities were limited.   [*Id.*]

Dr. Liedal concluded that Plaintiff seemed to have functional adaptive skills.   [*Id.*]

Dr. Liedal's mental status examination reflected normal appearance and behavior, though

Plaintiff seemed "melancholic, negative, down on himself, and needy."   [AR 439]   Plaintiff's

communication skills and thought content were normal and average, though his abilities to

understand more complex directions and language were below average.   [*Id.*]   Plaintiff's mood

was "flat, sad, and occasionally grimacing."   [*Id.*]   Plaintiff felt guilty about being sleepy and

"not working."   [*Id.*]   Dr. Liedal determined Plaintiff's mood was stable and depressed with no

overt signs of anxiety.   [AR 440]   Plaintiff's sensory and cognitive functioning, including

common sense, mental processing, and intelligence, were fair; Dr. Liedal concluded that

evidence of diminished capacity was unremarkable.   [*Id.*]

Dr. Liedal found no evidence supporting perceptual disturbances, posttraumatic stress

syndrome, aggressive behaviors, or dissociative events.   [*Id.*]   His findings were mixed with

respect to judgment and insight: problem solving abilities and behavioral understanding were

below average; consequential thinking and behavioral control was fair.   [*Id.*]

5

Dr. Liedal diagnosed Plaintiff with depressive disorder NOS and personality disorder NOS [schizoid, avoidant and dependent features].   [*Id.*]   Given the reported and observed symptoms, Dr. Liedal determined that Plaintiff's symptoms were chronic since childhood.   [AR 441]   He made the following functional assessment based on Plaintiff's age expectations: (1) Plaintiff's ability to follow instructions was normal; his ability to follow more complex directions was less than average; (2) Plaintiff's ability to concentrate and provide information, as well as perform simple tasks, was normal; his ability to perform multi-step tasks was below average; (3) Plaintiff's ability to relate to others was below average and he had a chronic history of social avoidance; and (4) Plaintiff's ability to withstand the stress of day-to-day work activity was below average.   [AR 441-42]

B.   MaryAnn Wharry, Psy. D.

On April 29, 2012, MaryAnn Wharry, Psy. D. reviewed the record, giving great weight to Dr. Liedal's opinion, and determined that Plaintiff was not disabled for purposes of SSD or SSI. [AR 76-85; 88-97]   She concluded that Plaintiff's condition resulted in some limitation in the ability to perform work related activities, but the condition was not severe enough to keep Plaintiff from working.   [AR 87]   Dr. Wharry explained that Plaintiff's symptoms "may interfere with completion of a normal workday or workweek or may cause inconsistent pace. However, when work does not require more than simple instructions, ordinary routines and simple work decision making, limitations of attendance and pace will not prevent completion of a normal workday[.]"   [AR 85]   Dr. Wharry determined that Plaintiff's work environment would need to require "[m]inimal interaction with coworkers, public and supervisors."   [*Id.*]

6

C.      Suzanne Orahood, Clinical Nurse Specialist

Suzanne Orahood is a Clinical Nurse Specialist at the Stout Street Clinic who stated that she met with Plaintiff for 30-45 minutes every six weeks.  [AR 513]   On October 16, 2012, Ms. Orahood completed a Mental Impairment Questionnaire assessing Plaintiff's limitations.  [AR 513- 520]   She identified the following symptoms: appetite, sleep, and mood disturbances; recurrent panic attacks; anhedonia or pervasive loss of interests; feelings of guilt/worthlessness; difficulty concentrating; social withdrawal or isolation; decreased energy; intrusive recollections of traumatic experiences; persistent anxiety; episodes of violence; and memory problems.  [AR 513-514]   Ms. Orahood determined that Plaintiff's limitations were marked, moderate or extreme in every category.  [AR 516-520]   She believed he would have difficulty working at a regular job on a sustained basis.  [AR 515]

D.      Elizabeth Cookson, M.D.

Dr. Cookson met with Plaintiff on June 13, 2013 and reviewed his medical record. While the record does not contain Dr. Cookson's examination notes, she wrote a letter "To Whom it May Concern" containing her opinion based on the examination and her review of Ms. Orahood's assessment in the Mental Impairment Questionnaire.  [AR 717, 733]   Dr. Cookson diagnosed Plaintiff with Recurrent Major Depression (still severe and chronic), PTSD, and Anxiety Disorder NOS.  [AR 717]   She reflected that "[a]lthough on casual observation he appears to not be disabled, he is an extremely anxious and nervous individual who feels intense guilt about his limitations."  [*Id*.]   Dr. Cookson opined that Plaintiff would be able to work for several months, but would need to be separate from others and would need frequent breaks.

[*Id.*]   However, she believed he would become overwhelmed after several months and would not be able to regularly attend work.   [*Id.*]   Dr. Cookson endorsed Ms. Orahood's assessment and concluded that Plaintiff's mental limitations were not consistent with competitive employment. [AR 717, 733]   She further noted that Plaintiff's treatment plan would be changed to target his symptoms and, therefore, his disability status should be reevaluated in two or three years.   [AR 717]

B.   Physical Impairments

Plaintiff suffered chronic back pain as a result of accidents and/or over-exertion.   He was pushed into a car and fell down stairs in 2010; in 2011, he got into a fight and had a job that required heavy lifting; and in 2012 he lifted a heavy suitcase. [AR 376-379, 414-416, 420-422] Despite these more recent events, Plaintiff stated at one visit that the pain began at age twenty [AR 407], and at another that he had experienced back pain for fifteen years.   [AR 696] Plaintiff described the pain as an ache that was sometimes relieved by walking [AR 696] but was aggravated by gardening and lifting. [AR 407]

On December 11, 2011, Plaintiff reported at the Stout Street Clinic with back pain resulting from heavy lifting at a new job.   [AR 305]   A month later, Plaintiff returned to the Stout Street Clinic and requested a letter from the doctor informing his employer of his physical work restrictions.   [AR 420]   Shahla Mousavi, MD, sent a letter to Plaintiff's employer the following day stating the Plaintiff was able to sit and sort envelopes but advising against Plaintiff lifting or carrying heavy objects.   [370]   Despite the work accommodations, Plaintiff's back pain persisted through July and August 2012, when he reported on two occasions that his pain

level reached a 10 out of 10 (on a scale of 1-10, with 10 representing extreme pain).  [AR 521, 524]

On June 24, 2013, Dr. Horsley reviewed Plaintiff's treatment notes to assess Plaintiff's physical residual functional capacity.  [AR 718-724]  Dr. Horsley concluded that Plaintiff could occasionally lift fifty pounds, stand, walk, or sit (with normal breaks) for about six hours in an eight-hour work day, push or pull without restriction, climb ladder/rope/scaffolds occasionally, stoop occasionally, and would need to avoid vibration and extreme concentrated exposure to the cold.  [AR 719-722]

### III.   Hearing Testimony

Plaintiff testified that he worked at a grocery store in 2000, beginning as a courtesy clerk and working his way up to assistant manager.  [AR 57]  Plaintiff remained employed grocery stores for several years before working for a lending company where he trained employees on how to take loan applications.  [AR 58]  He remained in that position for several years.  [*Id.*] In 2009, Plaintiff worked as a pool keeper and a grounds man "for a couple of years."  [AR 60] In 2011, Plaintiff worked for Ready Man Labor for two months before he was "fired because of [his] back."  [*Id.*]  At some point after the alleged amended onset date, he worked for one or two months at a café where his duties included washing dishes, sweeping, and sorting silverware and cups.  [AR55]  Plaintiff testified that the owner of the café fired him because "it wasn't in his budget to have me around anymore but I also know it wouldn't have worked out anyway because he was going to be doing some remodeling and doing a lot of stuff that would be heavy lifting there."  [AR 68]

Plaintiff testified about his mental state as follows: "I have problems just getting through every step of the day. I am scared. I'm really terrified. I'm tired yet I've got anxiety, just really depressed and I can't it's hard to explain but I just have this empty feeling that something terrible is going to happen and even when it doesn't I kind of wish it would because I just feel so bad." [AR 61]

Ashley Bryars, a vocational expert ("VE") also testified at the hearing. The ALJ asked the VE to consider whether a hypothetical individual who "would be limited to simple, unskilled work that could be learned in a month or less with occasional work interactions with co-workers and supervisors and rare-to-no-work interactions with the general public" would be able to perform any of Plaintiff's past jobs.  [AR 71]  The VE testified that such an individual could perform the work of a dishwasher or a landscape laborer.  [AR 71]  The ALJ then inquired about jobs the previous individual could perform with the following additional physical restrictions: only occasionally climb ladders, ropes and scaffolds, occasionally stoop, frequently climb ramps and stairs, frequently balance, kneel, crouch, and crawl and have only occasional exposure to extremes of cold and to vibrations.  [AR 71-72]  The VE responded that such a person could perform the jobs of dishwasher, night cleaner, or laundry worker.  [AR 72]  If the individual was also limited to carrying 20 pounds and performing only "light work," the VE testified that such a person could be a merchandise worker, housekeeping cleaner, or domestic laundry worker.  [*Id.*]  If that individual required sedentary work, the VE provided examples such as a microfilm document preparer, address clerk, or type copy examiner. [AR 73]

The ALJ next asked the VE about jobs for an individual of Plaintiff's age, education,

work experience, and physical and mental limitations who required frequent reminders and was unable to make independent decisions; the VE responded that such a person would only be capable of "sheltered work" as oppose to "competitive work."  [*Id*.]   Likewise, if such person were absent from work three or more days per month, the VE testified that would not be consistent with maintaining competitive employment.   [AR 74]

## LEGAL STANDARDS

**I.     SSA's Five-Step Process for Determining Disability**

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.   42 U.S.C. §§ 416(i), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements.   *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.   If she is, disability benefits are denied.   *See* 20 C.F.R. §§ 404.1520, 416.920.   Step

Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.  Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably

drawn therefrom.  If they are so supported, they are conclusive upon the reviewing court and

may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also*

*Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).  "Substantial evidence is more than a

scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept

to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence

nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th

Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir.

1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal

standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*,

92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ found that Plaintiff had not engaged in substantial gainful activity since April 2,

2010, the amended alleged onset date (Step One).  [AR 23] The ALJ then found that Plaintiff

suffered from severe impairments of "major depression, posttraumatic stress disorder (PTSD),

anxiety disorder NOS, personality disorder, and degenerative disc disease of the lumbar spine."

(Step Two).  [*Id.*]  The ALJ found, based on a review of the entire record, that Plaintiff's

impairments did not meet or equal the severity of one of the listed impairments deemed to be so

severe as to preclude substantial gainful employment (Step Three).  [AR 24]  The ALJ found

that Plaintiff had the RFC to perform medium work, with the following restrictions:

> [Plaintiff] can frequently climb stairs/ramps, balance, kneel, crouch, and crawl;
> occasionally climb ladders/ropes/scaffolds and stoop; and tolerate occasional

exposure to extreme cold and vibrations. Further, he is limited to simple, unskilled work that can be learned in one month or less; can have occasional work interactions with supervisors and coworkers; and have rare to no work interactions with the general public.

[*Id.*]

The ALJ found that "claimant's medically determined impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]"   [AR 25].   In support of this finding, the ALJ noted that Plaintiff indicated he is sometimes able to "find light duty work" and therefore he retains the capacity for some work.   [*Id.*]   Additionally, the ALJ concluded that the medical evidence did not support the alleged severity of Plaintiff's symptoms or limitations.   [*Id.*]

Plaintiff sought review of the ALJ's decision by the Appeals Council on September 20, 2013. [AR 15-16]   On January 29, 2015, the Appeals Council denied Plaintiff's request for review, making the SSA Commissioner's denial final for the purpose of judicial review.   [AR 2-7]   *See* 20 C.F.R. § 416.1481.   Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following four issues: (1) the ALJ's weighing of the opinion evidence was erroneous; (2) the ALJ erroneously determined that Plaintiff did not meet a listed medical impairment; (3) the ALJ's RFC findings regarding the severity of Plaintiff's mental impairments are not supported by substantial evidence; and (4) the ALJ's RFC findings

regarding Plaintiff's physical capacity to perform work are not supported by substantial evidence. Opening Brief, docket # 16 at 21, 25, 27, 30.

## ANALYSIS

### I.      Whether the ALJ's Weighing of the Opinion Evidence was Erroneous

Plaintiff argues the ALJ erred by not giving controlling weight to the opinions of Ms. Orahood or Dr. Cookson.   Opening Brief, docket #16 at 21-25.   Defendant responds that the ALJ explained her reasons for giving little weight to those opinions, and those reasons were consistent with the medical record.   Response, docket #17 at 10-15.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)).   The ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight [she] assigns to them."   *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted).   The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians.   *See* 20 C.F.R. § 416.927(c).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.   *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).   The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates.   *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d

at 1330.    If the opinion is not supported by medically acceptable evidence, then the inquiry at

this stage is complete.    *Watkins*, 350 F.3d at 1300.    However, if the ALJ "finds that the opinion

is well-supported, he must then confirm that the opinion is consistent with other substantial

evidence in the record."    *Id*.    If not, the opinion is not entitled to controlling weight.    *Id*.    In

contrast, if the medical opinion of a treating physician is well supported by medically acceptable

evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must

give it controlling weight.    *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10

(D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

If the opinion of a treating physician does not merit controlling weight or if there is no

opinion by a treating physician, the ALJ must move to step two and consider the following

factors in determining how to evaluate other medical opinions in the record: length of the treating

relationship, frequency of examination, nature and extent of the treating relationship, evidentiary

support, consistency with the record, medical specialization, and other relevant considerations.

*Id.*    "An ALJ may dismiss or discount an opinion from a medical source only if [her] decision to

do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if [she]

provides 'specific, legitimate reasons' for [the] rejection."    *Id.* (quoting *Chapo v. Astrue*, 682

F.3d 1285, 1291 (10th Cir. 2012)).

It is error for an ALJ not to adequately state and explain what weight she gives to medical

opinions.    *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).    The ALJ must give

"good reasons" for the weight she ultimately assigns each medical opinion.    *Watkins*, 350 F.3d at

1301.    The ALJ's decision must be sufficiently specific to make clear to any subsequent

reviewer the weight given to the medical opinion, and the reason for that weight.   *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).   Even though an ALJ is not required to discuss every piece of evidence, it must be clear that the ALJ considered all of the evidence.   *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).   "[I]n addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects."   *Id.* at 1010. Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion.   *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).   An ALJ may reasonably give less weight to a medical opinion that differs from that same doctor's notes.   *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

Here, the ALJ considered Ms. Orahood's opinion and found it "largely unpersuasive" for the following reasons:

> it is not from an 'acceptable medical source' (*see* 20 CFR 404.1513(a), 416.913(a)), it is markedly inconsistent with the largely normal mental status exams documented throughout the record, it is markedly inconsistent with the persuasive opinion of the examining psychologist . . .  and it is markedly inconsistent with the claimant's reports of intact and independent activities of daily living at the consultative exam . . . Moreover, its rather excessive limitations are inconsistent with Ms. Orahood's assessment that the claimant is able to manage benefits in his own best interest . . . Further, its indication of marked limitations of the claimant's ability to interact appropriately with others is not supported by his apparently intact ability to interact appropriately with his treatment providers and examining sources or with his subsequent ability to bond and interact appropriately with other members of a therapy group.  For all of these reasons, this opinion is accorded little weight.

[AR 28]

Plaintiff asserts that the ALJ should have afforded Ms. Orahood's opinion greater weight

because it was reviewed and endorsed by Dr. Cookson, the Director of Psychiatry at the Colorado Coalition for the Homeless, who had an ongoing relationship with Plaintiff.  [Opening Brief, docket #16 at 22]   The record reflects that Dr. Cookson met with Plaintiff on only one occasion, and she did not take examination notes, instead writing a letter to "Whom it May Concern" summarizing her opinion.  [AR 717]   Dr. Cookson's evaluation of Plaintiff was limited to a single visit in which no objective findings were documented; rather, Dr. Cookson's opinion was based almost entirely upon a review of Ms. Orahood's opinion.  [AR 733]   The ALJ explained that it gave little weight to Dr. Cookson's opinion because it was inconsistent with the largely normal mental status exams, it was inconsistent with the "persuasive and well supported opinions" of other physicians, and it was inconsistent with the Plaintiff's reports of "intact an independent activities of daily living[.]"  [AR 29]   In light of the evidence in the record, Dr. Cookson did not meet the criteria for a treating physician and the ALJ was not required to give her opinion controlling weight.  *See Branhum v. Barnhart*, 385 F.3d 1268, 1275-76 (10th Cir. 2004) (determining that ALJ did not err in rejecting a physician's opinion where claimant was seen frequently at a clinic but the physician only saw claimant on two occasions and the records reflected "little in the way of clinical findings or diagnostic tests" in support of the physician's conclusion that claimant was disabled).

The ALJ adequately explained her reasons for discounting the opinions of Ms. Orahood and Dr. Cookson, and the record supports the ALJ's analysis.   Therefore, the analysis should not be disturbed on appeal.

**II.** **Whether the ALJ Erroneously Determined that Plaintiff did not Meet a Listed Impairment**

Plaintiff contends that the ALJ erred at step three of her analysis and should have found Plaintiff met the criteria of a listed mental impairment.   Opening Brief, docket #16 at 25-27. Defendant responds that the ALJ's conclusion is supported by the only opinion directly on point on the issue, as well as the other evidence of record.   Response Brief, docket #17 at 15-16.

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. 404, Subpt. P, App. 1, § 12.04 (affective disorders), § 12.06 (anxiety disorders), and/or § 12.08 (personality disorders).   [AR 24]  Plaintiff points to Ms. Orahood's responses in the Supplemental Mental Impairment Questionnaire [AR 726-733] as evidence supporting a finding that he meets the listed impairments for an affective disorder and/or anxiety disorder.   Plaintiff's argument relies on the premise that Dr. Cookson's endorsement of Ms. Orahood's assessment in the questionnaire should be afforded great weight.   However, as previously addressed in the section above, the ALJ did not err in placing little weight on the opinions in the questionnaire.

Dr. Wharry's assessment is the only other opinion addressing the criteria for a listed impairment.   [AR 80]  With regard to the "B" criteria for affective and personality disorders, Dr. Wharry determined that Plaintiff had no restrictions of activities of daily living, moderate difficulties in maintain social functioning, concentration, persistence or pace, and no repeated episodes of decompensation.   [*Id.*]  In light of Dr. Wharry's opinion and the ALJ's properly analyzed decision to give little weight to Ms. Orahood's responses in the questionnaire, the ALJ

19

did not err in determining that Plaintiff's mental impairment did not meet the requisite severity for a listed impairment.

## III.   Whether the ALJ's RFC Findings Regarding Plaintiff's Mental Limitations are Supported by Substantial Evidence

Plaintiff next argues that ALJ's findings at step four regarding the severity of Plaintiff's mental impairments are not supported by substantial evidence.  Opening Brief, docket #16 at 28-30.  Defendant responds that the ALJ's findings are consistent with Plaintiff's treatment records, Plaintiff's statements, Dr. Liedal's opinion, and Dr. Wharry's opinion.  Response Brief, docket #17 at 16-18.

As discussed above, if the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must consider multiple factors in determining how to evaluate other medical opinions in the record.  *Sedlak*, 2014 WL 717914, at *10.  "An ALJ may dismiss or discount an opinion from a medical source only if [her] decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if [she] provides 'specific, legitimate reasons' for [the] rejection."  *Id.*  (quoting *Chapo*, 682 F.3d at 1291).  "However, an ALJ need not 'apply expressly each of the six relevant factors in deciding what weight to give a medical opinion,' so long as [she] provides 'good reasons in his decision' for the weight accorded to each opinion."  *Thielemier v. Colvin*, No. 12-cv-03178-PAB, 2014 WL 1292885, at *3 (D. Colo. Mar. 31, 2014) (quoting *Oldham*, 509 F.3d at 1258).  In addition, "[a]n ALJ's rejection of a medical opinion based on an incorrect reading of the record is grounds for remand."  *Sedlak*, 2014 WL 717914, at *10 (citing *Mercer v.*

*Colvin*, No. 12-CV-35-FHM, 2013 WL 785358, at *2 (N.D. Okla. Mar. 1, 2013)).

"[I]t is well settled that administrative agencies must give reasons for their decisions." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).   When determining whether the claimant's pain is credible, the ALJ must consider assertions of severe pain and decide whether the ALJ believed them.   *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).   To do this, the ALJ should consider factors such as:

> levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id*.   The ALJ must give a conclusion and the reasons for that conclusion, explaining "why the specific evidence relevant to each factor led [her] to conclude claimant's subjective complaints were not credible," affirmatively linking credibility findings to substantial evidence in the record. *Id*.   Further, because credibility determinations are within the province of the ALJ, a reviewing court may not upset such findings where they are supported by substantial evidence.   *See Quantu v. Barnhart*, 72 F. App'x 807, 811 (10th Cir. 2003).

Here, the ALJ based her RFC determination on numerous factors, beginning with the Plaintiff's testimony.   The ALJ noted that Plaintiff testified he could not work because of "anxiety, fear, depression, and empty and foreboding feelings[.]"   [AR 25]   However, the ALJ found that Plaintiff's allegations regarding the severity of his symptoms were "not entirely credible" in light of evidence about Plaintiff's daily living activities and his ability to perform

light work.   [*Id.*]   In addition to Plaintiff's testimony, the ALJ reached her RFC determination based on an extensive analysis of the medical evidence, and a weighing of the opinions.   [AR 25-31] The ALJ relied heavily on Dr. Liedal's assessment, in which Plaintiff reported he was able to take care of himself and perform activities of daily living independently and without assistance.   [AR 27]   The ALJ observed that Dr. Leidal's opinions about Plaintiff's mental abilities were consistent with "the largely normal mental status exams documented elsewhere in the record."   [AR 27]   For example, the ALJ referred to a visit where Plaintiff was off medication, yet his appearance was described as "neat, pleasant and euthymic" and another where Plaintiff claimed feeling "extremely" depressed and anxious, yet the exam showed "unremarkable psychomotor behavior, appropriate affect, and euthymic mood."   [AR 27-28; 663, 680-81]

The ALJ adequately explained her RFC determination based on Plaintiff's testimony at the hearing and a thorough review of the medical evidence and opinions. The ALJ's decision is supported by substantial evidence and should not be disturbed on appeal.

IV.     **Whether the ALJ's RFC's Findings Regarding Plaintiff's Physical Capacity to Perform Work are Supported by Substantial Evidence**

Plaintiff further argues that the ALJ's RFC findings were not supported by substantial evidence.   Opening Brief, docket #16 at 30-31.   Defendant responds that the ALJ's findings are supported by Plaintiff's treatment records, statements about his capabilities, and work history during the relevant period, as well as the opinions of Dr. Mousavi and Dr. Horsley.   Response Brief, docket #17 at 18-21.

The ALJ recognized that Plaintiff suffered chronic pain and the RFC finding reflected certain physical limitations based on that condition.   [AR 24]   The ALJ noted that pain medication improved the symptoms, and the examinations showed no back spasms or neurological defects.   [AR 29-30]   The ALJ reviewed a treating nurse practitioner's note from a December 11, 2011 visit advising that Plaintiff could return to work but could only perform light duties and could lift no more than ten pounds.   [AR 303]   The ALJ gave this opinion little weight because it was not from an acceptable medical source according to the regulations, and it was supported by minimal objective medical abnormalities documented in the treatment records. [AR 30]   Instead, the ALJ relied on Dr. Mousavi's "near-normal exam findings" and found persuasive Dr. Mousavi's opinion regarding Plaintiff's ability to sit and sort envelopes.   [AR 30] The ALJ also gave great weight to Dr. Horsley's opinion because "it is based on a review of the medical evidence and it is consistent with that evidence, which documents relatively benign physical exam findings and suggestions of greater physical capacity than the claimant alleges." [AR 31; [719-722]

In sum, the ALJ properly analyzed the medical evidence, provided adequate explanations for weighing each medical opinion, and relied on substantial evidence on the record in determining Plaintiff's RFC with regard to physical limitations. Therefore, the ALJ's opinion will not be disturbed on appeal.

## CONCLUSION

For the foregoing reasons, the Court concludes the ALJ did not err when evaluating the medical evidence and assigning an RFC to Plaintiff.   The ALJ considered all of Plaintiff's

alleged impairments, including intractable pain, and properly determined Plaintiff could perform other work in the economy based on the objective evidence and the VE's testimony.   The Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied.   Therefore, the decision of the ALJ that Plaintiff Scott Alan Stickline was not disabled and the final order of the Commissioner are **affirmed**.

Dated at Denver, Colorado this 26th day of April, 2016.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge